IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 2, 2019

## IN RE RONON G.

**Appeal from the Circuit Court for Lewis County**
**No. 2016-CV-20     Michael E. Spitzer, Judge**

_____

### No. M2019-01086-COA-R3-PT

Mother appeals the termination of her parental rights to her two children on grounds of abandonment by failure to establish a suitable home, substantial noncompliance with permanency plans, and persistence of conditions. We conclude that two grounds were not applicable to Mother's younger child because she was not removed from Mother's home. Because at least one ground was supported by the evidence as to each child, and the evidence clearly and convincingly shows that termination is in their best interest, we affirm the overall termination of Mother's parental rights as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed in Part; and Affirmed in Part**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and ANDY D. BENNETT, JJ., joined.

Richard Boehms, Hohenwald, Tennessee, for the appellant, Cassandra G.

Herbert H. Slatery, III, Attorney General and Reporter; Peako A. Jenkins, Assistant Attorney General; for the appellee, Tennessee Department of Children's Services.

### OPINION

#### I.     BACKGROUND

The Tennessee Department of Children's Services ("DCS") became involved with Respondent/Appellant Cassandra G.[1] ("Mother") in January 2014, due to concerns of environmental neglect of Mother's son, Ronon G.[2] Relevant to this appeal, DCS

---

[1] In cases involving termination of parental rights, it is this Court's policy to remove the full names of children and other parties to protect their identities.
[2] According to the dependency and neglect petition filed with regard to these children, Mother had previously had DCS intervention in 2012 when Ronon was an infant.

conducted a home study of Mother's home at that time and noted that it was filthy and unsuitable for a child. DCS also was concerned that Ronon was not wearing weather-appropriate clothes that fit him. Mother moved twice in quick succession, first to a home with no electricity and then to a home that had no stove or refrigerator. DCS set up services for Mother, but Mother gave birth to a second child, Persephone G., before the services began. A few days after her birth, Persephone was hospitalized at Vanderbilt Hospital in Nashville. Persephone underwent heart surgery and remained continuously at Vanderbilt Hospital for approximately two months.

During Persephone's hospitalization, Mother left Ronon with relatives; Mother lived sometimes with these relatives, often with other relatives, and sometimes in Nashville.[3] DCS provided the relatives caring for Ronon with various necessary supplies because Mother did not provide them and the relatives could not afford them. DCS was also concerned because Mother was doing little to maintain her bond with Ronon during this time. Following heart surgery and recovery, Persephone was set to be released on two conditions: (1) her caregiver was required to provide a sterile environment free of cigarette smoke, pets, and other irritants; and (2) the caregiver was required to spend 48-hours in the hospital "rooming-in" to learn to provide the care necessary for the child under hospital supervision. Mother did not complete the rooming-in period and she was not able to provide a home meeting these requirements. Moreover, the relatives caring for Ronon could not provide for him due to financial issues.[4] As such, the children came into DCS custody by ex parte custody order on August 21, 2014. The children were placed with a foster family ("Foster Family") that completed the rooming-in period and that was qualified to care for a medically fragile child. The children continued to reside with Foster Family at the time of the termination petition.

DCS filed a termination petition on August 18, 2016.[5] Therein, DCS alleged grounds for termination of abandonment by failure to provide a suitable home, substantial non-compliance with permanency plans, and persistence of conditions. DCS filed an amendment to their petition on August 31, 2018, to add the ground of mental incompetence. The trial court thereafter denied Mother's motion to strike the amendment but granted Mother's request for a continuance. A trial was held on March 29, 2019. The proof consisted of the testimony of several DCS workers, foster mother, and the deposition of a mental health professional retained to evaluate Mother's mental competence. Mother did not testify or call any witnesses on her behalf.

---

[3] In particular, when asked where the family was living after Persephone's birth, a DCS worker testified that in addition to other places, "they were staying at Myra's a little bit and [with other relatives] a little bit, but there wasn't anywhere definite"; testimony from DCS clarified that "Myra" was the relative where Ronon was living at the time of the eventual removal. Prior to Persephone's birth, Ronon stayed with Mother even when she was "bouncing around from place to place."

[4] This home was also not suitable for Persephone.

[5] The petition also sought termination of the parental rights of the children's fathers; they are not at issue in this appeal.

DCS presented several parenting plans that were ratified by the juvenile court. The general focus of the plans, as detailed *infra*, was for Mother to establish a safe and stable home, for Mother to engage in visitation so as to bond with the children, for Mother to participate in mental health treatment, and for Mother to obtain a legal means of income.

Mother's housing situation was a significant issue at trial. Following the removal, Mother moved into a home with her current boyfriend. Two home visits revealed that the house was filthy and lacked appropriate furniture and food for the children.[6] Mother soon left this residence, as she claimed that her boyfriend was abusive. For the next several years, Mother moved from home to home, often staying with friends and relatives. Sometimes Mother would not allow DCS to complete home visits on the homes; sometimes home visits revealed the homes to be unsuitable. Mother never provided a lease showing that she had obtained any kind of stable residence and no home visit ever concluded with a finding that Mother has a safe and stable residence for the children.

Mother had various jobs following the removal of the children, but none that lasted for a significant period of time. The only proof of income provided to DCS was a handwritten statement from 2014 stating that Mother has been paid $272.00. Mother paid some child support following the removal, but was not consistent. In September 2015, Mother was held in criminal contempt for her failure to pay child support.

Mother was provided supervised visitation following the removal of the children, as well as parenting classes; Mother completed parenting classes and the visitation was eventually increased. Mother missed some visits, often without timely notice. During other visits, she would play on her phone; as such, DCS asked Mother to leave her phone in her car during visits. When Mother was attentive, she gave the majority of her attention to Ronon to the exclusion of Persephone. As such, Persephone was allowed to engage in unsafe behaviors until stopped by DCS. Mother also provided unsafe food to Persephone. During visits and other communications with DCS, Mother spoke to DCS mostly about herself; outside of visits, Mother never asked about the children's well-being. Foster Mother eventually stopped coming to visits because the children looked to her for direction, rather than Mother. Because Mother did not apply the skills she learned in parenting classes during the visitations, DCS offered Mother additional classes; Mother declined, stating that she did not need them.

Both children, but especially Persephone, had various medical and developmental issues that were well taken care of by Foster Family. For example, following her discharge from Vanderbilt Hospital, Persephone was initially required to attend weekly

---

[6] On the second visit, Mother had attempted to remedy the lack of appropriate furniture. Rather than buying an appropriate crib for infant Persephone and toddler Ronan, Mother had purchased a bunk bed. Mother claimed that she had a crib, but it was undisputedly not present in the home.

doctor's appointments. Ronon was developmentally delayed, nonverbal, and suffered from an emotional issue that manifested with physical symptoms. Both children, however, were improving in Foster Family's care by the time of trial, with Persephone needing only yearly appointments for her heart condition. Although Mother was encouraged to attend all of the children's appointments, Mother attended relatively few appointments, and mostly only those that were scheduled during her visitation time.

The children are bonded to their Foster Family, who wishes to adopt the children. The children refer to their foster parents as "mom and dad," while Mother is referred to as "birth mom." Ronon once told Mother that she was "not [his] mommy." According to the testimony, the children are also bonded with Foster Family's extended family, as well as the school, church, and neighborhood to which they belong.

Finally, the deposition testimony of a psychological examiner was admitted into evidence. Mother admittedly suffers from depression, anxiety, and bipolar "tendencies" but reported that she was medicated and had historically attended counseling.[7] The examiner testified as to the tests performed on Mother to determine her mental competence. Although Mother's mental capabilities fell in the average range, the examiner opined that Mother presented a high risk to be abusive and that she was not able to adequately care for her children were she to have sole responsibility for them.

Following trial, the trial court entered a written order finding sufficient proof of the grounds of abandonment by failure to provide a suitable home, substantial non-compliance with permanency plans, and persistence of conditions. The trial court did not, however, find sufficient proof of mental incompetence. The trial court further found that termination was in the children's best interests. Mother thereafter filed a timely appeal.

## I.  ISSUES PRESENTED

On appeal, Mother challenges each of the grounds found by the trial court, as well as the trial court's finding that termination is in the children's best interest.

## II.  STANDARD OF REVIEW

The Tennessee Supreme Court has previously explained that:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. ***Troxel v. Granville***,

---

[7] According to the testimony, however, Mother sometimes failed to take medication when she felt it was not working. The record was not clear as to whether Mother was attending counseling at the time of trial.

530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors. . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522–23 (Tenn. 2016) (footnote omitted). In Tennessee, termination of parental rights is governed by statute which identifies "'situations in which that state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove: (1) existence of one of the statutory grounds and (2) that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases. *Santosky*, 455 U.S. at 769. As such, a party must prove statutory grounds and the child's best interests by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c); *In re Valentine*, 79 S.W. 3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence[,]" and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In termination cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W.3d at 523−24 (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007)). Our supreme court further explains:

- 5 -

The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.,* 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.,* 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 524.

Lastly, in the event that the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). This Court therefore "gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

## III.   DISCUSSION

### A. Grounds for Termination

The trial court found three grounds for termination of Mother's parental rights: abandonment by failure to establish a suitable home, substantial noncompliance with permanency plans, and persistence of conditions. In this case, the evidence supporting each ground generally overlaps. This, however, is not a bar to finding multiple grounds for termination. See Tenn. Code Ann. § 36-1-113(g) ("[A]cts or omissions in one ground does not prevent them from coming within another ground[.]"). We will therefore consider each ground in turn.

### 1.  Abandonment by Failure to Establish a Suitable Home

Under Tennessee Code Annotated section 36-1-113(g)(1), "[a]bandonment by the parent or guardian, as defined in § 36-1-102" may constitute a ground for termination. Section 36-1-102(a) in turn contains several definitions for the statutory ground of abandonment. At the time the petition was filed, the relevant definition of abandonment provided as follows:

The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in

which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department; . . . .

Tenn. Code Ann. § 36-1-102(1)(A)(ii) (2016).[8]

As noted above, this statute requires that the children be "removed **from the home** of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child[.]" *Id.* (emphasis added). This Court has previously concluded that this ground was inapplicable when the evidence did not establish that the child at issue was removed from the parent-at-issue's home. *See, e.g., In re K.M.K.*, No. E2014-00471-COA-R3-PT, 2015 WL 866730, at *5 (Tenn. Ct. App. Feb. 27, 2015) (noting the lack of evidence as to the father's residence and the fact that the children were not living with the father at the time of the removal); *In re Maria B.S.*, No. E2012-01295-COA-R3-PT, 2013 WL 1304616, at *10 (Tenn. Ct. App. Apr. 1, 2013) (reversing as to this ground when the children were not removed from the father's home). Likewise, Mother argues that this ground is inapplicable because the children were not removed from her home at the time they came into DCS custody. Instead, Ronon was staying with relatives, and Persephone was residing at Vanderbilt Hospital.

---

[8] This definition of abandonment was amended following the filing of the petition in this case. *See* 2018 Tenn. Laws Pub. Ch. 875 (H.B. 1856), eff. July 1, 2018. In relevant part, the current version of the statute now requires that the child be removed "from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child[.]" Tenn. Code Ann. § 36-1-102(1)(A)(ii) (2019). DCS concedes that the above language is not applicable to this case.

Here, the evidence shows that Ronon was staying primarily with Mother's relatives at the time of the removal. The evidence indicates, however, that Mother was also staying at this residence periodically prior to the removal, making this residence her home as much as any of her other periodic residences. Moreover, Mother placed Ronon with relatives because she had no home of any kind in which to keep him, and she was spending a great deal of time in Nashville due to Persephone's temporary hospitalization. The evidence does not show that any formal action had taken place to place Ronon with relatives, such as a court order.

Ronon's removal, therefore, is analogous with the removal that occurred in *In re Amarria L.*, No. M2017-00878-COA-R3-PT, 2018 WL 1391627 (Tenn. Ct. App. Mar. 20, 2018), where the mother left the child unsupervised at a homeless shelter; the child was thereafter removed from the shelter and placed in DCS custody. *Id.* at *6. Other cases have come to similar conclusions. *See, e.g., In re Roger T.*, No. W2014-02184-COA-R3-PT, 2015 WL 1897696, at *8 (Tenn. Ct. App. Apr. 27, 2015) (affirming this ground where the mother was incarcerated and the children were staying in a camper that lacked food and space). In another case in which removal from the parent's home was a prerequisite to the ground for termination at issue, this Court affirmed the trial court's finding that the child was removed from the father's home even though the physical removal of the child by DCS occurred at the mother's home. *See In re Alleyanna C.*, No. E2014-02343-COA-R3-PT, 2015 WL 4773313, at *14 (Tenn. Ct. App. Aug. 10, 2015) (involving persistent conditions, the requirements of which are discussed, *infra*). To reach that result, we considered the fact that the father had joint physical custody of the child and custody of the child had never been legally placed solely with the mother or other relatives. *Id.* Moreover, the father admitted that he could not provide a stable home for the children at the time of the removal. *Id.*

Although Ronon was not left totally unsupervised, Ronon was removed from a home where he was placed by Mother when she admittedly had no other suitable home for the child to go. The evidence suggests that Mother also periodically stayed in this home around the same time frame. Prior to that time, both Mother and the child had been "bouncing around" among relatives' homes. Moreover, the home where Mother left Ronon was not equipped to care for him, leaving him little better than unsupervised at a shelter. Likewise, no action was ever taken to place formal custody with relatives prior to the removal by DCS. Under these circumstances, we decline to interpret the language of section 36-1-102(1)(A)(ii) in such a restrictive manner as to make the ground inapplicable in this situation. We therefore conclude that the trial court properly applied this ground to Ronon.

The same cannot be said of Persephone. At the time of the removal, Persephone was not residing in a home of any kind, but at Vanderbilt Hospital. Although Mother was spending considerable time in Nashville, she was not living with Persephone at the hospital, as evidenced by her failure to complete the mandatory rooming-in period.

Indeed, it appears that Persephone spent no more than ten days total in Mother's home and certainly was not in Mother's home at the time of the removal. We are constrained by the plain language of the applicable version of the statute to only apply this ground where the child was removed from the parent's "home." Thus, despite the overwhelming evidence that Mother did not have a suitable home for Persephone at the time of removal, we cannot conclude that Persephone was in fact removed from Mother's home.[9] Consequently, we are forced to reverse this portion of the trial court's order.

Mother next argues that DCS did not make reasonable efforts to help Mother establish a suitable home during the relevant time period. Respectfully, we disagree. Here, the evidence shows that DCS provided Mother with several resources and detailed steps to help her procure adequate housing, to improve Mother's parenting skills, and to improve the condition of Mother's home. DCS also provided services to Mother related to Persephone's medical issues. Although Mother utilized some of the services, Mother refused other services because she stated she did not need help.

These efforts exceeded Mother's efforts. Although Mother did move into an apartment following the removal, two home visits revealed that the apartment was filthy and inappropriate for the children. This residence, however, did not last. A few months later, Mother's transient lifestyle returned when she again moved from one home to another, staying often with friends and relatives. On more than one occasion, Mother refused to allow DCS to inspect the homes. Thus, the proof showed that compared to Mother's efforts, DCS "made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child[.]" Tenn. Code Ann. § 36-1-102(1)(a)(ii).

Finally, the proof showed that Mother had no suitable home for Ronon to return to at trial and it was unlikely that she could provide one in the near future. Although Mother initially made some progress in securing an apartment, the apartment was not suitable and even that stability was fleeting. Thereafter, Mother moved to various places, some of which she refused to allow DCS to inspect, others of which were unsuitable. Although DCS continued to attempt to inspect Mother's home, its efforts never resulted in a single home being declared suitable for the children. By the time the petition was filed, Mother was living with a non-relative whose home was not suitable for children. Moreover, in her brief, Mother does not point to any evidence that she had a safe and stable home at the time of the termination trial. Rather, she points only to the apartment that she previously had around November 2014. Respectfully, evidence of a purportedly suitable

---

[9] As previously discussed, this language was amended to also include removal from a parent's "physical or legal custody." Tenn. Code Ann. § 36-1-102(1)(A)(ii) (2019). This amendment likely removes the anomalous result of making this ground inapplicable in the cases where a lack of suitable home is most obvious and in need of remediation—when a parent has no home whatsoever for the child to be placed.

home years prior to trial is not sufficient when DCS presented evidence that Mother's living situation has been neither safe nor stable in the years since that time. In a similar case, we have observed that a parent's "past efforts cannot compensate for her present [lack of housing.]" *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at \*12 (Tenn. Ct. App. Mar. 2, 2009). Here, Mother was still living no more than a transient lifestyle by the time of trial and lacked "residential stability"; as such, she did not have a suitable home, despite reasonable efforts by DCS. *See In re Seth B.*, No. E2017-00173-COA-R3-PT, 2017 WL 4082484, at \*9 (Tenn. Ct. App. Sept. 14, 2017) (affirming this ground where the evidence showed the parents lived a transient lifestyle). Mother's inability to maintain suitable housing for any period of time demonstrates "a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date[.]" Tenn. Code Ann. § 36-1-102(1)(a)(ii). As such, this ground for termination is affirmed as to Ronon.

## 2. Substantial Noncompliance with Permanency Plans

Pursuant to Tennessee Code Annotated section 36-1-113(g)(2), a ground for termination exists when "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4[.]" Four permanency plans are at issue in this case, the first three containing generally the same requirements.[10] Mother was generally required to (1) abide by court orders regarding child support; (2) maintain supervised visitation; (3) maintain an appropriate home; (4) provide a legal means of income to support the family; (5) maintain the children in an environment safe and free from harm; (6) establish an appropriate bond with the children; (7) meet Mother's mental health needs.

The determination of whether there has been substantial noncompliance with a permanency plan is a question of law, to be reviewed on appeal de novo with no presumption of correctness. *In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002). Termination of parental rights under Tennessee Code Annotated section 36-1-113(g)(2) "requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). To succeed under section 36-1-113(g)(2), DCS "must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656–57 (citing *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003)). Second, DCS must show that "the parent's noncompliance is substantial in light of the degree of noncompliance and the importance

---

[10] The fourth permanency plan was geared toward adoption and therefore Mother had no responsibilities under the plan. A fifth permanency plan was ratified immediately prior to the filing of the termination petition. Mother argues that this plan should not be considered. DCS does not address this plan in its brief and we therefore will not consider it.

of the particular requirement that has not been met." ***In re M.J.B.***, 140 S.W.3d at 657 (citing ***In re Valentine***, 79 S.W.3d at 548–49; ***In re Z.J.S.***, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at * 12 (Tenn. Ct. App. June 3, 2003)).

The trial court found that the requirements were both reasonable and related to the remedying the conditions that led to the removal of the children. Mother, however, takes issue with one requirement, that she establish a bond with the children. According to Mother, this requirement is not related to the reasons that the children came into custody, which Mother contends was merely due to environmental issues. We respectfully disagree. According to the testimony, at the time of the removal, DCS was concerned not only with the physical environment of Mother's home, but also with the fact that she was not spending any time with Ronon, focusing all her energy on Persephone.[11] Although this may have been reasonable under the circumstances, it was also reasonable for DCS to ask Mother to establish a bond with both children.

Mother also argues that this ground should be reversed because DCS did not exercise reasonable efforts, citing ***In re R.L.F.***, 278 S.W.3d 305 (Tenn. Ct. App. 2008), *overruled by **In re Kaliyah S.***, 455 S.W.3d 533 (Tenn. 2015). In 2015, however, the Tennessee Supreme Court held that reasonable efforts were not a prerequisite to termination under this ground. ***In re Kaliyah***, 455 S.W.3d at 555 ("[W]e hold that, in a termination proceeding, the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent."). Thus, Mother's allegation that DCS did not make reasonable efforts is not a bar to the application of this ground, but may be considered in the best interest analysis.

Having reviewed the evidence, we conclude that the trial court did not err in finding that Mother substantially failed to comply with the relevant permanency plans. Here, as discussed above, Mother has failed to make lasting effort to establish and maintain an appropriate home for the children; Mother's continued lack of a stable residence indicates that Mother has made little progress toward maintaining the children in a safe environment. Indeed, even when Mother was offered homemaking services to improve the condition of her home, she refused these services under the belief that she did not need them. Mother also failed to make consistent child support payments, leading to one instance of criminal contempt over her failure to do so. Moreover, Mother has not been consistent with visitation, failing to provide appropriate snacks, diapers, and wipes at many visitations, failing to appear at some scheduled visitations, and often failing to appropriately supervise the children during the visits. Indeed, Mother was asked by DCS to leave her phone in the car because she paid more attention to it than her children

---

[11] Mother's focus at the time of removal is in contrast to her apparent focus during the visitations that took place in this case; rather than focus solely on Persephone during those visitations, Mother focused primarily on Ronon.

- 11 -

during the precious few hours she was allowed to spend with them each month. Mother also provided no proof to DCS or at trial of consistent employment. Rather, the proof showed that Mother could not maintain any employment for a significant length of time. Mother had also not made a significant effort to bond with the children. Even though Mother did attend DCS provided parenting classes, she did not utilize the skills she learned and she declined additional classes. She also missed many of the children's medical appointments. Mother did, however, participate in a mental health intake and counseling. While Mother did make an effort toward some of the requirements of the parenting plan, we must conclude that Mother's efforts fell far short. Instead, her noncompliance was "substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 657. As such, the trial court's determination as to this ground is affirmed.

### 3. Persistence of Conditions

The final ground for termination found by the trial court is commonly referred to as persistence of conditions or persistent conditions. For purposes of this case, the ground of persistent conditions is defined as follows:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
>> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
>> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
>> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home; . . . .

Tenn. Code Ann. § 36-1-113(g) (2016).[12]

"A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20

---

[12] This ground was amended following the filing of the petition at issue. *See* 2018 Tenn. Laws Pub. Ch. 875 (H.B. 1856), eff. July 1, 2018. Again, we apply the version of the statute in effect at the time the termination petition was filed.

(Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at \*7 (Tenn. Ct. App. July 13, 2000)). The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. & M.S.*, 2000 WL 964775, at \*6 (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion is that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 461675, at \*20 (Tenn. Ct. App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at \*9 (Tenn. Ct. App. Mar. 3, 2008)).

Mother again argues that the trial court erred in applying this ground because the children were not removed from her home. As previously discussed, although Ronon was removed from Mother's home, Persephone was not. Accordingly, this ground for termination is reversed as to Persephone.[13]

Having reviewed the evidence, however, we affirm this ground for termination as to Ronon. At the time of trial, the child had been removed from Mother's custody for a period of over four years pursuant to adjudication of dependency and neglect. In that time, Mother's situation did not improve, instead she moved from one unsuitable home to another, never making any real progress. Indeed, even when resources were offered to Mother by DCS, she refused some services under the belief that she did not need help, only to claim that DCS did not do enough to help her in her appellate brief. Based on the evidence presented, the conditions that led to the child's removal, particularly the lack of safe, stable housing and a means of support, have not been remedied and appear unlikely to be remedied in the near future. These conditions make Mother's home unsafe and prevent Ronon from being adopted by Foster Family, the family that Ronon has known for the majority of his life. As such, there is ample evidence in the record to support this ground for termination as to Ronon.

## B. Best Interest

Having determined that at least one ground for termination is supported by clear and convincing evidence as to each child, we proceed to consider whether clear and

---

[13] Again, recent amendments alter the language to add that removal from the home or from "the physical or legal custody" of the parent is sufficient for purposes of this ground. Tenn. Code Ann. § 36-1-113 (g)(3)(A) (2019).

convincing evidence supports the trial court's determination that termination of Mother's parental rights is in the children's best interests. "Upon establishment of a ground for termination, the interests of the child and parent diverge, and the court's focus shifts to consider the child's best interest." *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). Even where a parent is unfit, termination may not necessarily be in the best interests of the child. *Id.*

Tennessee's termination statute lists the following factors to be used in the best interest analysis:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

The Tennessee Supreme Court has explained that:

- 14 -

Facts considered in the best interests analysis must be proven by a preponderance of the evidence, not by clear and convincing evidence. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests. When considering these statutory factors, courts must remember that the child's best interests are viewed from the child's, rather than the parent's, perspective. Indeed, a focus on the perspective of the child is the common theme evident in all of the statutory factors. When the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child.

*In re Gabriella D.*, 531 S.W.3d 662, 681–82 (Tenn. 2017) (internal citations omitted). Furthermore, "[a]scertaining a child's best interests does not call for a rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. The analysis requires "more than tallying the number of statutory factors weighing in favor of or against termination." *In re Gabriella D.*, 531 S.W.3d at 682 (citing *White v. Moody*, 171 S.W.3d 187, 193–94 (Tenn. Ct. App. 2004)). "The facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case," and the analysis "must remain a factually intensive undertaking." *In re Gabriella D.*, 531 S.W.3d at 682. Thus, "[d]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing *In re Audrey S.*, 182 S.W.3d at 878). In undertaking this analysis, the court must examine all of the statutory factors, as well as other relevant proof put forth by the parties. *Id.*

As to the first two factors, Mother argues that she has made a lasting adjustment of circumstances to make it safe and in the child's best interest to be in her home, citing her prior arguments as to suitable home and persistence of conditions. *See* Tenn. Code Ann. § 36-1-113(i)(1) & (2). Respectfully, we cannot agree. As we previously held, despite DCS's reasonable efforts, Mother has made no lasting progress in providing a safe and stable home life for the children in the nearly five years that they have been in DCS custody. These factors weigh heavily in favor of termination.

Mother's visitation history is also troubling. *See* Tenn. Code Ann. § 36-1-113(i)(3). The evidence shows that Mother missed many visitations, sometimes without appropriate notice. Mother also failed to attend many of the scheduled medical appointments with the children. When Mother did visit, she was often inattentive and more concerned with her phone than her children. She also failed to appropriately parent Persephone, creating dangerous situations. As a result, Mother does not have a meaningful relationship with the children. *See* Tenn. Code Ann. § 36-1-113(i)(4). The proof shows that Foster Mother is the parent that the children look to for support, even

- 15 -

when Mother is present. The children are strongly bonded to their foster family and a change in caretakers would be detrimental to their well-being. *See* Tenn. Code Ann. § 36-1-113(i)(5). Here, Mother made no effort to learn to take care of Persephone's medical needs. Instead, Persephone has relied on foster family for all but three months of her life.[14] Both children are happy and healthy with their new family, where their emotional and medical needs are provided for. By the time of trial, even Ronon had lived with Foster family for longer than he had been in Mother's custody. Moreover, Mother's physical environment still has not been shown to be safe or stable. *See* Tenn. Code Ann. § 36-1-113(i)(5), (7). As such, these factors support termination.

Although there are no abuse allegations in this case, the record does show that Mother neglected Ronon by placing him with relatives who could not financially support him and failing to provide necessities. *See* Tenn. Code Ann. § 36-1-113(i)(6). There was, however, no evidence of drug abuse or criminal activity in Mother's home. *See* Tenn. Code Ann. § 36-1-113(i)(7). Although the trial court rejected DCS's attempt to find Mother mentally incompetent to care for the children, the trial court did state that the findings of the mental examination were troubling. Still, the evidence was somewhat unclear as to whether Mother was appropriately seeking counseling and medication to treat her mental health issues. *See* Tenn. Code Ann. § 36-1-113(i)(8). Mother did not, however, consistently pay child support. *See* Tenn. Code Ann. § 36-1-113(i)(9).

From the totality of the circumstances, we conclude that DCS presented clear and convincing evidence that termination is in the children's best interests. Despite nearly five years to obtain employment and suitable housing, Mother was no closer to providing these necessities at trial as she was at the time of the removal. During the years of this removal, Mother also made little effort to maintain a relationship with her children, choosing to spend her time with the children on her phone rather than engage with them. On the other hand, the children are happy and their health is improving in a home that provides for their needs. Foster Family also wishes to adopt the children, providing them the stability that is sorely lacking from Mother's life. As such, the trial court's best interest finding is affirmed.

## IV. CONCLUSION

The judgment of the Lewis County Circuit Court is reversed in part and affirmed in part. The termination of Cassandra G.'s parental rights is affirmed as modified. Costs of this appeal are taxed to Appellant Cassandra G., for which execution may issue.

---

[14] And during those three months prior to foster care, much of Persephone's care was done by Vanderbilt Hospital. Indeed, Mother refused to even participate in the 48-hour rooming-in period that would have allowed Persephone to be returned to her, had, of course, Mother had an appropriate home to return to.

_____
J. STEVEN STAFFORD, JUDGE